UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**SEALED**

| | | |
|---|---|---|
| IN THE MATTER OF THE | * | MISC. NO. 15-901 |
| APPLICATION OF THE UNITED | | |
| STATES OF AMERICA FOR AN | * | SECTION: "E" |
| ORDER AUTHORIZING THE | | |
| INTERCEPTION WIRE AND | * | |
| ELECTRONIC COMMUNICATIONS | | |
| AND E-911 INFORMATION FROM | * | |
| CELLULAR TELEPHONE: (504) 296- | | |
| 8951 ESN: 270113183512944912 | * | |

*       *       *

## AFFIDAVIT IN SUPPORT OF APPLICATION

Your Affiant, Robert Baird, being duly sworn, deposes and states as follows:

1)      Affiant is a Special Agent (SA) with the Federal Bureau of Investigation (FBI),

United States Department of Justice.     Affiant has been so employed by the FBI for

approximately four (4) years.  Affiant is currently assigned to the FBI New Orleans Gang Task

Force (NOGTF).  This Task Force includes federal, state, and local officers investigating illegal

gang activity in the Metropolitan New Orleans area.  Affiant has participated in investigations

involving narcotics, street gangs, and violent crimes.  Affiant has participated in investigations of

alleged illegal narcotics trafficking and racketeering offenses, and is thoroughly familiar with the

investigative techniques used in these investigations, such as the use of undercover Agents, the

use of cooperating witnesses and confidential informants, the analysis of telephone toll pen

register information, search and seizure warrants, grand jury investigations, and interception of wire and oral communications.

2)       Affiant is an "investigative or law enforcement officer" as defined in Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

## PURPOSE OF AFFIDAVIT

3)       This affidavit is submitted in support of an order authorizing the interception of wire and electronic communications and E-911 Precise Location information, wire communications including voice-mail messages as they are left and retrieved, push to talk communications (PTT), and background conversations while the **Target Telephone** is off the hook or otherwise in use, of **MIGUEL JOSEPH** (hereinafter referred to as **JOSEPH**); **DONALD EALY** (hereinafter referred to as **EALY**);   **EDWARD LAWRENCE, JR.** (hereinafter referred to as **LAWRENCE**); **MICHAEL KIRTON** (hereinafter referred to as **KIRTON**); and others as yet unknown, hereinafter collectively referred to as "**Target Interceptees**," occurring both to and from cellular telephone number **(504) 296-8951**, **Electronic Serial Number (ESN) 270113183512944912** (the "**Target Telephone**"), which is maintained by Sprint, and subscribed to by TEDD CODE, with no address provided, and utilized by **JOSEPH**, concerning the following enumerated offenses, hereinafter referred to as "**Target Offenses**":

   a) Title 21, United States Code, Section 841(a)(1): distribution and possession with intent to distribute controlled substances;

b) Title 21, United States Code, Section 843(b): unlawful use of communication facilities in committing and/or causing or facilitating the commission of a felony offense; and

c) Title 21, United States Code, Section 846: attempt and conspiracy to distribute and possess with intent to distribute controlled substances.

4) The authorization given is intended to apply not only to the **Target Telephone** number listed above, but also to any other telephone number subsequently assigned to or used by the instrument bearing the same electronic serial number used by the **Target Telephone**, within the thirty-day period. The authorization is also intended to apply to the **Target Telephone** number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the **Target Telephone** while the telephone is off the hook or otherwise in use.

5) Because of Affiant's personal knowledge, as well as reports made to him by other members of the NOGTF, the Saint Tammany Parish Sheriff's Office (STPSO), the Jefferson Parish Sheriff's Office (JPSO), and the New Orleans Police Department (NOPD), Affiant is thoroughly familiar with the information obtained during this investigation. Based on this familiarity, Affiant alleges that the facts contained in the paragraphs below show that there is probable cause to believe that the **Target Interceptees** have and are presently committing the **Target Offenses** against the United States.

6) The facts and circumstances of this investigation, as set forth below, demonstrate that there is probable cause to believe that **JOSEPH** is utilizing **Target Telephone** to communicate with the **Target Interceptees** in connection with the commission of the **Target Offenses**. In particular, these communications are expected to reveal specific information concerning the **Target Offenses**, including:

a)  the administration, management, and conduct of the organization;

b)  the identity of the principals and participants in this narcotics conspiracy;

c)  discussions concerning plans to assault, injure, or murder persons who have violated the rules of the organization, are suspected of informing authorities of illegal gang activities, or are believed to be cooperating in some way with law enforcement;

d)  the progress and success of the narcotics trafficking activities of the organization, as well as the dissemination of narcotics information, orders, and instructions to subordinates and associates;

e)  the precise nature, methods, dates, scope, and locations of the narcotics trafficking business of the **Target Interceptees** who are members of the organization;

f)  the identities and roles of accomplices, aiders and abettors, co-conspirators of the **Target Interceptees**, and other participants in their illegal activities;

g)  the telephones of accomplices, associates, and co-conspirators of the **Target Interceptees**;

h)  the distribution and transfer of the contraband/narcotics and money involved in the illegal activities;

i)  the existence and location of records relevant to those illegal activities;

j)  the location and source of resources used to finance the illegal activities of the organization;

k)  the location and disposition of the proceeds from those activities;

l)  the items used in furtherance of those activities and their location; and

m)  in addition, these communications are expected to constitute admissible evidence of the above-described offenses.

## BASIS OF INFORMATION

7)     I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following information sources:

a) my experience investigating the illegal receiving, concealment, importation, buying, selling, and possession of dangerous controlled substances;

b) oral and written reports and documents about this investigation that I have received from members of FBI and NOGTF, and officers of the STPSO and other law enforcement agencies;

c) discussions I have had personally concerning this investigation with experienced investigators regarding the illegal receiving, concealment, importation, buying, selling, and possession of dangerous narcotics;

d) physical surveillance conducted by FBI, STPSO, JPSO, NOGTF, officers of the NOPD, and other law enforcement agencies, the results of which have been reported to me either directly or indirectly;

e) public records;

f) telephone toll records, pen register and trap and trace information, and telephone subscriber information;

g) statements of confidential sources and cooperating witnesses;

h) consensually monitored phone calls to the **Target Telephone**; and

i) controlled purchases of heroin made from **JOSEPH** and **LAWRENCE**, as well as through a third party working with **EALY**.

5

8)     Because this affidavit is being submitted for the limited purpose of securing authorization for the interception of electronic communications, wire communications, and E-911 Precise Location information, Affiant has not included each and every fact known to him concerning this investigation. Affiant has set forth only the facts believed necessary to establish the necessary foundation for an order authorizing the interception of electronic communications, wire communications, and E-911 Precise Location information.

**TARGET INTERCEPTEES**

9)     Information concerning the **Target Interceptees** comes from the following sources and criminal indices: telephone toll analysis, confidential source debriefings, surveillance, controlled drug buys, inmates' recorded jail calls, seizures of evidence, arrests, and consensual communications. The following individuals are expected to be intercepted:

| | |
|---|---|
| Name: | **MIGUEL JOSEPH, aka "Pretty"** |
| Date of Birth: | 08/22/1986 |
| Race/Sex: | Black/Male |
| Addresses: | 2320 Spain Street, New Orleans, LA |
| **Target Telephone**: | **(504) 296-8951, ESN: 270113183512944912** |
| Other Phone: | (504) 994-8173 |
| Role: | From October 2014 to the present, **JOSEPH** sold heroin on numerous occasions to an undercover officer and a confidential source working with law enforcement. **JOSEPH** initially used phone number (504) 994-8173 to coordinate these drug sales, but began using the **Target Telephone** in January 2015. |
| Criminal History: | |

| | | |
|---|---|---|
| 12/3/2003 | Manufacture / Distribution / Possession Schedule I; Possession of Marijuana | Convicted, Possession of Marijuana – probation |
| 12/31/2003 | Possession of Cocaine (Crack); Flight from an Officer | Convicted, Possession of Cocaine (Crack) – 3 years |
| 7/24/2004 | First Degree Robbery | Charges dropped |

| | | |
|---|---|---|
| 8/2/2004 | Second Degree Murder | Charges dropped |
| 2/10/2005 | Manufacture / Distribution / Possession Schedule I; Possession of Marijuana | Convicted, Possession of Marijuana – probation |
| 1/24/2007 | Possession of Firearm / Carrying a Concealed Weapon by Convicted Felon | Not convicted |
| 9/12/2007 | Possession With Intent to Distribute Cocaine (Crack); Possession of Cocaine (Crack) | Convicted, Possession of Cocaine (Crack) – 1 year, probation. |
| 5/10/2011 | Felon Carrying Illegal Weapon; Possession of Weapon with Obliterated Serial Number; Possession of Marijuana; Possession of Drug Paraphernalia | Convicted, Attempted Possession of Gun with Obliterated Serial Number, Felon with Firearm, and Possession of Heroin – probation |
| 8/1/2011 | Possession With Intent to Distribute Heroin; Possession of Heroin | Convicted, Possession of Heroin – 78 months |

Name:                **DONALD EALY, aka "Deebo"**
Date of Birth:       08/04/1978
Race/Sex:            Black/Male
Address:             3027 Loyola Street, Apartment F, New Orleans, LA
Cellular Telephones: (225) 226-2186
                     (504) 232-5677
Role:                **EALY** is a known associate of **JOSEPH**, and according to one informant, believed to be **JOSEPH's** source of supply.

Criminal History:

| | | |
|---|---|---|
| 9/17/1996 | Possession With Intent to Distribute Cocaine (Crack); Battery of a Police Officer | Convicted, Possession With Intent to Distribute Cocaine (Crack) – 5 years; Battery of a Police Officer – 60 days |
| 3/23/1997 | Battery of a Police Officer | Convicted – 4 months |
| 12/4/1997 | Battery of a Police Officer | Refused |
| 9/18/2000 | Armed Robbery | Refused |
| 3/3/2002 | Possession of Cocaine (Crack) | Refused |
| 7/12/2002 | Possession of Marijuana | Convicted – 65 days |
| 5/5/2005 | Possession With Intent to Distribute Cocaine (Crack); Illegal Carrying of Weapons with Narcotics; Possession With Intent Marijuana; Possession of Firearm by a Felon; Possession of Cocaine (Crack) | Case dismissed |
| 10/24/2007 | Possession of a Firearm by a Felon | Refused |
| 9/29/2009 | Possession of Marijuana | Nolle Prosequi |
| 5/22/2012 | Possession With Intent to Distribute Heroin; Possession With Intent to Distribute Marijuana; Distribution of Cocaine (Crack); Possession of Marijuana; Possession of Drug Paraphernalia | Convicted, Possession of Drug Paraphernalia and Marijuana -- 1 year |

| 9/4/2013 | Possession With Intent to Distribute Marijuana; Sell/Distribute Drug Paraphernalia; Possession With Intent to Distribute Cocaine; Possession of Marijuana | Convicted, Possession of Marijuana – probation |
|---|---|---|

Name: **EDWARD LAWRENCE, Jr.**
Date of Birth: 08/20/1983
Race/Sex: Black/Male
Address: 1641 Arts Street, New Orleans, LA
Cellular Telephone: 504-256-8813
Michelle Jefferson, his girlfriend, has phone number (504) 710-2411
Role: **LAWRENCE** has participated in four heroin transactions, acting as the middle man for **JOSEPH**. Additionally, **LAWRENCE** was present in **EALY's** apartment in 2013 at the time that the New Orleans Police Department executed a search warrant that resulted in **EALY's** arrest for possession with intent to distribute cocaine.

Criminal History:

| 10/16/2002 | Simple Robbery, Theft | Convicted, Theft – 90 days |
|---|---|---|
| 6/23/2005 | Assault | Convicted – 1 year |
| 7/10/2006 | Resisting Arrest | Convicted – 15 days |
| 1/17/2008 | Possession of a Controlled Substance | Convicted – 2 years |
| 3/13/2010 | Intent to Give False Information to Police | Convicted - 45 days |

Name: **MICHAEL KIRTON**
Date of Birth: 03/29/1978
Race/Sex: Black/Male
Address: 2369 North Villere Street, New Orleans, LA
Cellular Telephones: (504) 600-0567
(985) 297-3813
Role: **KIRTON** has been tied to the aforementioned phone numbers.

Criminal History:

| | | |
|---|---|---|
| 1/8/1999 | Simple Burglary of Inhabited Dwelling | Convicted – 1 year |
| 2/16/1999 | Simple Robbery | Convicted, Attempted Simple Robbery – 1 year |
| 2/26/2000 | Possession of Cocaine (Crack); Battery on a Police Officer; Resisting an Officer | Refused |
| 1/12/2003 | Aggravated Battery with Dangerous Weapon | Refused |
| 11/1/2009 | Aggravated Assault; Resisting a Police Officer with Force | Convicted, Resisting an Officer – 6 months |
| 7/28/2010 | Possession With Intent to Distribute Cocaine; Possession of Alprazolam | Convicted – 8 years |

**PRIOR APPLICATIONS**

10)      On February 27, 2015, FBI Electronic Surveillance indices revealed there were no previous applications made to any judge for authorization to intercept, or for approval of the interceptions of, oral, wire, or electronic communications involving any of the same persons or target facilities specified in the Affidavit.  On February 26, 2015, an Immigration and Customs Enforcement (ICE) search showed that no other previous applications were made to any judge for authorization to intercept, or for approval of the interceptions of, oral, wire, or electronic communications involving any of the same persons or target facilities specified in the Affidavit. On February 26, 2015, a Drug Enforcement Administration (DEA) applications search showed that no other previous applications were made to any judge for authorization to intercept, or for

approval of the interceptions of, oral, wire, or electronic communications involving any of the same persons or target facilities specified in the Affidavit.

## BACKGROUND INFORMATION

11)     Based upon Affiant's experience and conversations with other experienced investigators, Affiant knows that:

a) Essential and integral parts and instruments of narcotics distribution rings are telephones and safe narcotics distribution locations;

b) The distribution of controlled substances is typically carried out through a network of distributors and sub-distributors;

c) Due to the large amount of money derived from the distribution and sale of narcotics, individuals involved sometimes use violent acts such as threats and murder to control the drug market in their area.

## RELIABILTY OF INFORMANTS

12)     Agents of the FBI and local officers have received information from a confidential source of information, hereinafter referred to as Cooperating Source (CS)[1], and from an undercover officer (UC), concerning the illegal drug-trafficking activities of members of a drug-trafficking organization operating in the Eastern District of Louisiana.

a) CS has been providing reliable information to detectives of STPSO and the FBI since the fall of 2014.   Specifically, CS has provided information about suspected narcotics distribution activities in the vicinity of the Saint Roch neighborhood of New Orleans.[2] Since October 2014, CS has made three controlled purchases of heroin from **JOSEPH**

---

[1]     CS has a criminal history which includes aggravated assault, disturbing the peace, possessing drug paraphernalia, and operating a vehicle while intoxicated.  CS is working for financial compensation and for potential consideration with pending criminal charges in a state criminal case in Saint Tammany Parish.

[2]     The Saint Roch neighborhood is bound by Benefit Street, Peoples Avenue, Almonaster Avenue, Saint Claude Avenue, Elysian Fields Avenue, and Florida Avenue.

and at least one controlled purchase from Thomas Gordon, which was arranged by **EALY**. CS knows **EALY** to be the leader of a group of individuals selling narcotics in and around Saint Roch. CS knows that **EALY's** brother, Danny Ealy, had been killed in a drug-related dispute in the summer of 2014. After his brother's murder, **EALY** moved to Baton Rouge for several months, and passed much of his drug-dealing business to his associates, including **JOSEPH**. CS is voluntarily cooperating with law enforcement. CS's information concerning **EALY** and **JOSEPH**. CS is reliable, and his/her information has never been found to be false or misleading.

b) UC is a full time Sheriff's Deputy with STPSO. The UC has conducted numerous undercover operations in and around the New Orleans area. The UC has participated as an undercover employee on state and federal cases.

## FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE

13)    The investigation of the narcotics distribution organization was initiated in September of 2014, when members of the NOGTF, along with officers from STPSO, NOPD, and JPSO, began collecting intelligence on **JOSEPH, EALY,** and other members of the organization. The narcotics distribution organization operates in and around the Saint Roch neighborhood of New Orleans, Louisiana. Each of the four **Target Interceptees** is from this neighborhood. This part of town has been plagued by numerous shootings and murders over the past few years. Many of these shootings and murders are suspected to be drug-related.

14)    Based on information provided by NOPD, STPSO, CS, and the UC, NOGTF has identified to date approximately six (6) individuals involved with the narcotics distribution organization. The individuals, including **JOSEPH**, have numerous arrests for charges that

include murder, possession of heroin and cocaine, illegal carrying of weapons, and armed robbery.

15)     Affiant and other members of the NOGTF have made many attempts to surveill **JOSEPH** and other members of the narcotics distribution organization.  These attempts were met with limited results.  **JOSEPH** and other members of the organization operate in a neighborhood that is unfriendly to law enforcement.  Many of the residents of the neighborhood quickly pass word by cellular telephone when law enforcement is in the area.

16)     In September of 2014, STPSO advised members of the NOGTF of information they had learned from CS in relation to **JOSEPH** and **EALY**.  CS advised members of the NOGTF that **JOSEPH** sold heroin in Saint Roch using telephone number (504) 994-8173.  As discussed below, CS (and eventually, the UC) called (504) 994-8173 to set up numerous drug transactions with **JOSEPH** from October 2014 until January 13, 2015, at which time **JOSEPH** abandoned (504) 994-8173 and began using the **Target Telephone**.

### Three Heroin Transactions in October/November of 2014 Between CS and JOSEPH Using (504) 994-8173

17)     On three dates in October and November of 2014—October 15, 2014, October 24, 2014, and November 5, 2014—CS conducted controlled purchases of heroin from **JOSEPH**.  On each of the three occasions, the CS placed consensually-recorded calls and text messages to **JOSEPH** at telephone number (504) 994-8173 to arrange for the purchase of $200 worth of heroin.  Through text messages and telephone conversations, the CS and **JOSEPH** agreed upon the heroin amount, meeting time, and meeting location for each of the heroin transactions.  For example, the text message conversation setting up the transaction on October 15, 2014, started in this way:

CS: Can I come see you

13

CS: Is it good!

**JOSEPH**: Ok lowes

**JOSEPH**: N yea

CS: 200

Through previous experience and explanation by the CS, Affiant believes that this conversation proposed a meeting at or near the Lowe's Home Improvement store on Elysian Fields Avenue in New Orleans for the purchase of "good" quality heroin for $200.00.

On all three occasions, after arranging the meeting time and location, the CS and **JOSEPH** met in the vicinity of the Saint Roch neighborhood. On all three occasions, NOGTF members conducted surveillance of the meetings between the CS and **JOSEPH**. Each time, **JOSEPH** approached the CS's vehicle on foot and exchanged six baggies of a tan powdery substance for $200.00. Each time, the baggies and their contents weighed between 1.5 and 2.5 grams, and each time a sample of the powder field-tested positive for the presence of heroin.

18)     A review of telephone records by Affiant for calls to/from (504) 994-8173 on the dates of the transactions confirms contacts between CS and **JOSEPH** at phone number (504) 994-8173 during the transactions.

### Heroin Transaction on November 13, 2014 Between UC and JOSEPH Using (504) 994-8173

19)     On November 13, 2014, at approximately 12:45pm, the UC contacted **JOSEPH** on (504) 994-8173 and arranged for the purchase of $200.00 of heroin. The UC was provided with $200.00 in drug-buy money and was dispatched to the same Lowe's parking lot to make contact with **JOSEPH**. The UC was provided with an audio and video recorder. At approximately 1:17pm, the UC texted **JOSEPH** at (504) 994-8173, "hope you didn't forget about me." **JOSEPH** replied, "No I'm coming." At approximately 1:30pm, the UC received a

call from **JOSEPH** from (504) 994-8173, when **JOSEPH** explained that he was with his parole officer and that he would "be there" in five minutes. During the call, **JOSEPH** provided directions to the UC to the intersection of Mandeville Street and N. Rocheblave Streets, New Orleans. The UC drove to the above intersection and met with **JOSEPH**, who was driving a gray Nissan Altima bearing Louisiana license plate YHN696 (which was registered to Linda Joseph, 2320 Spain Street, New Orleans, LA, whom authorities believe to be **JOSEPH's** mother). **JOSEPH** was accompanied by an unidentified passenger in the car. **JOSEPH** came to the driver's side window and gave the UC six baggies of brown powder in exchange for the $200.00 in drug-buy money. The UC departed the area and turned over the evidence to Agents. The brown powder field tested positive for heroin and weighed approximately 1.74 grams. Law enforcement later determined that the video recorder malfunctioned, however the audio recorder captured audio of the transaction.

20)     A review of telephone records by Affiant for calls to/from (504) 994-8173 on the date of the transaction confirms contacts between UC and **JOSEPH** during the time of the transaction.

### Heroin Transaction on November 20, 2014 Between UC and JOSEPH Using (504) 994-8173

21)     On November 20, 2014, at approximately 12:48pm, the UC contacted **JOSEPH** on (504) 994-8173 and arranged for the purchase of $300.00 worth of heroin. The UC was provided with $300.00 in drug-buy money and was dispatched to the same Lowe's parking lot to make contact with **JOSEPH**. The UC was provided with an audio and video recorder. After arriving at Lowe's, the UC contacted **JOSEPH** on (504) 994-8173 to tell **JOSEPH** that he/she was there. At approximately 1:00pm, the UC received an incoming call from **JOSEPH**, where **JOSEPH** confirmed that the UC wanted $300.00 worth of heroin, and explained that the heroin

would come in one "chunk" instead of being individually bagged. The UC confirmed that the transaction would occur at the "same place as last time." The UC began traveling to the intersection of N. Rocheblave and Mandeville Streets. **JOSEPH** and the UC then had a final phone call on (504) 994-8173, where **JOSEPH** gave the UC directions to go to the intersection of N. Miro and Mandeville Streets. Shortly after the UC arrived at that location, a black 2003 Infiniti sedan, Louisiana license YJY462, registered to Linda Joseph, 2320 Spain Street, New Orleans, pulled in front of the UC. An unknown black male with dreadlocks exited the passenger seat of the Infiniti, approached the passenger side of the UC's vehicle, and exchanged a bag of brown powder for $300.00 in drug-buy money. Although this male was unknown at the time, as discussed *infra* paragraph 33, the UC later identified this individual as **LAWRENCE**. The UC departed the area and turned over the evidence to Agents. The brown powder, which was compressed in a chunk, field tested positive for heroin and weighed approximately 1.66 grams. The transaction was successfully captured and recorded by the video and audio recording devices.

22)    A review of telephone records by Affiant for calls to/from (504) 994-8173 on the date of the transaction confirms contacts between UC and **JOSEPH** during the time of the transaction.

### Heroin Transaction on December 4, 2014 Between UC and JOSEPH Using (504) 994-8173

23)    On December 4, 2014, at approximately 12:50pm, the UC contacted **JOSEPH** on (504) 994-8173 and arranged for the purchase of $200.00 of heroin. The UC was provided with $200.00 in drug-buy money and was dispatched to the same Lowe's parking lot to make contact with **JOSEPH**. The UC was provided with an audio and video recorder. After arriving at Lowe's, the UC contacted **JOSEPH** on (504) 994-8173 to tell **JOSEPH** that he/she was there,

but the call went unanswered.  **JOSEPH** called the UC back from phone number (504) 994-8173, and instructed the UC to go to the same area as the previous sale.  The UC left the Lowe's parking lot and traveled to Mandeville Street and N. Rocheblave Street.  At approximately 1:13pm, **JOSEPH** entered the driver's seat of the same Nissan Altima, registered to Linda Joseph, which was parked on the 2300 block of Spain Street.  The UC called **JOSEPH** at phone number (504) 994-8173 to inform **JOSEPH** that he/she was at N. Rocheblave and Mandeville Street.  At approximately 1:15pm, **JOSEPH** parked his Altima behind the UC's vehicle, and approached the UC on foot.  **JOSEPH** took the $200.00 of controlled purchase money, and gave the UC six individually-wrapped baggies containing a tan powder.  The UC departed the area and turned over the evidence to Agents.  The tan powder field-tested positive for heroin and weighed approximately 1.65 grams.  The transaction was successfully captured and recorded by the video and audio recording devices.

24)     A review of telephone records by Affiant for calls to/from (504) 994-8173 on the date of the transaction confirms contacts between UC and **JOSEPH** during the time of the transaction.

### First Known Use of Target Telephone—Heroin Transaction on January 13, 2015 Between UC and JOSEPH Using Target Telephone

25)     On January 13, 2015, the UC contacted **JOSEPH** on (504) 994-8173 and arranged for the purchase of $200.00 of heroin.  **JOSEPH** requested that the UC call when the UC was on his/her way to meet.  The UC was outfitted with an audio and video recording device.  At approximately 1:04pm, the UC called **JOSEPH** at (504) 994-8173 to tell **JOSEPH** that he/she was on the way.  During the call, **JOSEPH** stated, "Yeah, what you wanted?"  The UC stated, "Two hundred," and **JOSEPH** responded "Alright."  Affiant believes that the UC was communicating the desire to purchase $200.00 worth of heroin, and **JOSEPH** was agreeing to

sell the heroin.  A short time later, the UC received two calls from **Target Telephone**.  The UC did not answer because the UC did not recognize the number.  The UC then received a text from **Target Telephone**, indicating, "This pretty."  The UC understood **JOSEPH's** nickname to be "Pretty."  The UC called back **Target Telephone**, and **JOSEPH** answered.  **JOSEPH** instructed the UC that **Target Telephone** was his new phone number.  **JOSEPH** told UC to call **Target Telephone** when the UC was close to the meeting spot.  A short time later, the UC called **Target Telephone** and received directions from **JOSEPH**.  **JOSEPH** explained the directions to the UC as he/she drove through the neighborhood.  When the UC said that he/she was turning right off of Franklin Avenue at the red light (North Galvez Street), **JOSEPH** said "At the first street make a left."  The UC confirmed with **JOSEPH** that he was talking about Painters Street.  **JOSEPH** told the UC, "Stop and pull over."  The UC arrived at the location first.  At approximately 1:30pm, **JOSEPH** arrived driving the same Infiniti sedan, registered to Linda Joseph.  An unknown black male with dreads, later identified as **LAWRENCE**, exited the passenger's side of the Infiniti and approached the UC's vehicle.  The UC exchanged $200.00 for six baggies of heroin with **LAWRENCE**.  The UC departed the area and met with agents to turn over the evidence.  The baggies field tested positive for heroin and weighed approximately 1.31 grams.  The transaction was successfully recorded by the video and audio recording devices.

26)     A review of telephone records by Affiant for calls to/from (504) 994-8173 and **Target Telephone** on the date of the transaction confirms contacts between UC and **JOSEPH** during the time of the transaction.

### Heroin Transaction on January 20, 2015 Between UC and JOSEPH Using Target Telephone

27)     On January 20, 2015, at approximately 11:28am, the UC contacted **JOSEPH** on **Target Telephone** and arranged for the purchase of $300.00 of heroin.  During the course of the

recorded conversations between the UC and **JOSEPH** on the **Target Telephone**, **JOSEPH** asked the UC, "What you wanted?"  The UC responded "Three, can I get three this time?" **JOSEPH** said, "Three hundred?" and the UC responded, "Yep, three hundred is what I've got." **JOSEPH** said, "Alright."  Affiant believes that the UC was communicating the desire to purchase $300.00 worth of heroin, and **JOSEPH** agreed.  The UC was provided with $300.00 in drug-buy money and video and audio recording devices.  The UC was dispatched to the same Lowe's parking lot.  **JOSEPH** called the UC from **Target Telephone** and directed the UC to drive into the adjacent neighborhood.  At approximately the same time, a black male matching **JOSEPH**'s physical description, wearing a white T-shirt and a red hat entered the same Nissan Altima, registered to Linda Joseph, which was parked at 2320 Spain Street.  The UC called **JOSEPH** on the **Target Telephone**, and directed the UC to the meeting location.  The UC pulled up behind the Altima, and **JOSEPH**, wearing a white T-shirt and a red hat, exited the driver's seat.  **JOSEPH** approached the driver's door of the UC's vehicle and exchanged nine baggies (each containing tan powder) for $300.00.  **JOSEPH** returned to the Altima and both vehicles departed the area. The UC met with Agents to turn over the evidence, which weighed approximately 2.35 grams and field-tested positive for the presence of heroin.  The Agents transported the recordings and evidence to the FBI office for storage.  The transaction was successfully captured and recorded by the video and audio recording devices.

28)     A review of telephone records by Affiant for calls to/from **Target Telephone** on the date of the transaction confirms contacts between UC and **JOSEPH** during the time of the transaction.

### Heroin Transaction on February 4, 2015, Between UC and JOSEPH Using Target Telephone

29)     On February 4, 2015, at approximately 11:25am, the UC contacted **JOSEPH** on

**Target Telephone** and arranged for the purchase of $400.00 of heroin. At approximately 12:08pm, the UC returned a missed call to **JOSEPH** on **Target Telephone**. During the conversation, **JOSEPH** asked the UC, "What you want, since I'm fuck'n with this shit right now, and I can just put it all into one, and I ain't got to make no baggies. I'll just put it all into one. What you had wanted?" The UC responded, "I wanted four. I've got four hundred." **JOSEPH** said, "Alright, I'll just put it all into one." Affiant believes that **JOSEPH** was breaking down a larger quantity of heroin into smaller amounts; that **JOSEPH** asked the UC how much heroin the UC wanted, and the UC said that he/she wanted $400.00 worth; and that that **JOSEPH** would put the entire amount into one bag as opposed to using multiple bags. The UC was provided with $400.00 in drug-buy money and video and audio recording devices. The UC was dispatched to the same Lowe's parking lot. At approximately 1:10pm, the UC sent a text message to **JOSEPH** at **Target Telephone**, stating, "At Lowe's." **JOSEPH** then called the UC to say that he would call back when it was time for the UC to depart Lowe's. At approximately 1:13pm, NOGTF surveillance units observed a tan Chevrolet Blazer, bearing Louisiana license plate XXM520, later determined to be registered to Michelle Jefferson, 2410 Lavender Street, New Orleans, LA, departing the vicinity of 2560/2562 North Galvez Street. As discussed *infra* paragraph 33, law enforcement believes Michelle Jefferson to be **LAWRENCE's** girlfriend. At approximately 1:38pm, **JOSEPH** called the UC from **Target Telephone** and said to go to Painter's Street. The UC departed the Lowe's parking lot and drove to Painter's Street. After the UC arrived, the same tan Blazer drove up and parked next to the UC's car. A black male with dreadlocks (later identified as **LAWRENCE**) leaned out from the driver's door of the Blazer and exchanged one baggie, which contained compressed tan powder, for $400.00. The tan powder was packaged in one single bag which was consistent with the

earlier phone call on the **Target Telephone** with **JOSEPH**.  The UC could not see any other passengers in the tan Blazer.  Both vehicles departed the meeting location.  At approximately 1:42pm, members of the NOGTF surveillance team observed the tan Blazer return to a parking space adjacent to 2560/2562 North Galvez Street.  **LAWRENCE** exited the Blazer and entered the front door of 2562 North Galvez.  The UC met with Agents to turn over the evidence, which weighed approximately 1.63 grams and field-tested positive for the presence of heroin.  The Agents transported the recordings and evidence to the FBI office for storage. The transaction was successfully recorded by the video and audio recording devices.

30)     At approximately 4:06pm, the UC called **JOSEPH** at **Target Telephone**.  The UC told **JOSEPH** that when he/she got home and weighed the heroin, it was about 1.7 grams, whereas the UC was expecting 2 grams.  **JOSEPH** said that he thought it was 2 grams, but the scale might have been off.  The UC also said that he/she had recently inherited some money, and would like to buy a larger amount of heroin from **JOSEPH**.  **JOSEPH** confirmed that he would sell larger quantities to the UC.

31)     A review of telephone records by Affiant for calls to/from **Target Telephone** on the date of the transaction confirms contacts between UC and **JOSEPH** during the time of the transaction.

### Heroin Transaction on February 19, 2015 Between UC and JOSEPH Using Target Telephone

32)     On February 19, 2015 at approximately 12:35pm, the UC contacted **JOSEPH** on **Target Telephone** and arranged for the purchase of $200.00 of heroin.  The UC was provided with $200.00 in drug-buy money and video and audio recording devices.  The UC was dispatched to the same Lowe's parking lot.  As the UC approached the Lowe's parking lot, he/she called **JOSEPH** at the **Target Telephone**.  The UC said, "I am pulling into Lowe's."

JOSEPH asked, "What you wanted today?" and the UC responded, "Two, I got two hundred on me this time." JOSEPH said, "Alright, you're pulling into Lowe's. Look I, look, I'm gonna tell you what to do. Pull down Florida, and um, come to Painters. When you get to Painters and Rocheblave, I want you to go on the other side of Franklin . . . It's been too hot on this side, so I want you to go to Franklin, but on the other side." Affiant believes that the UC was communicating the desire to purchase $200.00 worth of heroin, and JOSEPH agreed. Furthermore, Affiant believes that JOSEPH was telling the UC that he detected law enforcement presence, and wanted to meet the UC in an alternate neighborhood. The UC drove toward Franklin Avenue. The UC called JOSEPH again on the Target Telephone. JOSEPH informed the UC that he could see the UC, and directed the UC to follow him to a meeting location. The UC followed the same tan Blazer, registered to Michelle Jefferson, to the parking lot of the *Ja-Kels* store near the intersection of Jasmine Street and Franklin Avenue. The UC could not see the driver of the Blazer. A black male wearing a white and black shirt with medium length braids (later identified as LAWRENCE) exited the passenger's side of the Blazer and walked to the passenger's side of the UC's vehicle, where he exchanged six baggies (each containing tan powder) for $200.00. Both vehicles departed the area. At approximately 2:32pm, the NOGTF surveillance units observed the tan Blazer backing into a parking spot adjacent to 2560 North Galvez Street. The UC met with Agents to turn over the evidence, which weighed approximately 1.48 grams and field-tested positive for the presence of heroin. The Agents later transported the recordings and evidence to the FBI office for storage. The transaction was successfully recorded by the video and audio recording devices.

33)     The Agents, in an attempt to identify the driver of the tan Blazer, reinstituted the surveillance after the completion of the heroin transaction. At approximately 3:18pm, the tan

Blazer was observed by NOGTF surveillance units departing the parking area adjacent to 2560 North Galvez Street.   Agents performed a traffic stop of the Blazer in the vicinity of Peoples Street and Myrtle Street.   An Agent approached the driver (the only occupant) of the Blazer and asked him to step out and provide his license and registration.   The driver provided a Louisiana identification card which identified him as Edward Lawrence Jr., 1641 Arts Street, New Orleans, LA 70117, LA ID # 00794170, DOB: 08/20/1983.   This was the first time that Agents were able to identify **LAWRENCE** by name.   The Agent asked **LAWRENCE** for a contact phone number, and **LAWRENCE** provided phone number (504) 281-2950.[3]   The Agent asked **LAWRENCE** whom the vehicle belonged to, and **LAWRENCE** stated it belonged to his girlfriend.   **LAWRENCE** picked up a photograph that was on the dashboard and showed it to the Agent, indicating that it was a picture of himself and his girlfriend.   After returning to the office, the Agent identified the female in the photograph as Michelle Jefferson, DOB: 11/26/1984.   As previously stated, the tan Blazer is registered to Michelle Jefferson. Additionally, the Agent reviewed the video footage captured by the UC of the heroin transaction and confirmed that the man in the video was **LAWRENCE**.   The UC further identified **LAWRENCE** as the same individual who had previously sold the UC heroin on multiple occasions.

34)     A review of telephone records by Affiant for calls to/from **Target Telephone** on the date of the transaction confirms contacts between UC and **JOSEPH** during the time of the transaction.

---

[3]        This phone number appears to be fake or incorrect.  The number is not associated with any toll records for phone numbers known to the investigation, including **LAWRENCE's**. Additionally, AT&T, which maintains the phone number, had no toll records from January 19, 2015, through February 19, 2015.  Affiant suspects that **LAWRENCE** intentionally misled the agent by giving an incorrect number.  **LAWRENCE's** criminal history reveals that he has been arrested on three different occasions for providing false information to law enforcement officers.

**Role of Interceptee Donald EALY**

35)     At the inception of this investigation, the CS identified **EALY** as a mid-level heroin dealer who is involved in a narcotics distribution organization, which includes **JOSEPH**, operating out of the Saint Roch neighborhood.   In August 2013, NOPD used a confidential informant to perform a controlled purchase of crack cocaine from **EALY** at 2419 North Claiborne Avenue, Apartment B, New Orleans, LA, an address where **EALY** had been staying. After the purchase, NOPD obtained a search warrant for the residence.   When NOPD executed the warrant, they encountered **LAWRENCE** sleeping on the couch in the front room of the residence. According to the CS, before the summer of 2014, **EALY** had been a source of supply to **JOSEPH**.   But in the summer of 2014, **EALY's** brother was murdered in the Saint Roch neighborhood.   Fearing for his life, **EALY** went into hiding in Baton Rouge, Louisiana, leaving his heroin distribution activities in Saint Roch to **JOSEPH** and others.   Early in 2015, **EALY** returned to the New Orleans area and began distributing heroin again.   On February 9, 2015, the CS, working with NOGTF, contacted **EALY** on phone number (225) 226-2186, which the CS knew through previous interactions to be a phone number that **EALY** used for purposes of purchasing heroin.   **EALY** instructed the CS to call "Cuzz."  The CS knew **EALY** to be referring to Thomas Gordon, aka "Ice," at phone number (504) 723-2026.   After placing the call, the CS met Gordon at an apartment that the CS knew to be affiliated with **EALY**.   There, they exchanged money for heroin inside of the CS's vehicle.   Due to a miscommunication between the CS and Gordon, the CS did not have enough controlled-purchase money at the time of the transaction.   The CS agreed to complete the payment to Gordon on a later date.   On February 16, 2015, the CS met Gordon at 3027 Harmony Street, Apartment F, New Orleans, Louisiana, to settle up the debt.   At the time of payment, both **EALY** and Gordon were present in the

apartment.

## WIRE AND ELECTRONIC COMMUNICATION PEN REGISTER AND TOLL RECORD ANALYSIS

36)       Pursuant to administrative subpoenas, Sprint has provided historical toll records for the **Target Telephone** for the period of November 11, 2014, to February 8, 2015.   In addition, on February 6, 2015, United States Magistrate Judge Joseph C. Wilkinson, Jr. entered an order authorizing prospective pen register coverage for **Target Telephone**.   That coverage was initiated on February 9, 2015.

37)       A review of toll records and pen register data established that, between December 30, 2014, and March 10, 2015, **Target Telephone** was used for a total of 19,622 telephone calls or text messages.   Of those records, Affiant believes 6,394 to be text messages.   As described below, telephone analysis revealed that **Target Telephone** contacted or was contacted by the **Target Interceptees** identified in this affidavit.

38)       Affiant believes that **JOSEPH** has been in touch with **LAWRENCE** through the **Target Telephone**.   Affiant believes that **LAWRENCE** has used two phone numbers to communicate with **JOSEPH**.   One phone number is (504) 710-2411.   Subscriber information for this number is unknown; however, an Experian database review has tied the number to **LAWRENCE's** girlfriend, Michelle Jefferson, at 2410 Lavender Street, New Orleans.   As noted above, the tan Blazer that **LAWRENCE** used to conduct heroin transactions with the UC is also registered to Jefferson.   Beginning on February 2, 2015, **Target Telephone** had contact with telephone number (504) 710-2411 on thirty-three (33) occasions, with the last occurring on March 8, 2015.   Three (3) of those contacts were text messages, with the last occurring on March 8, 2015.

39)     Affiant believes that **LAWRENCE** has also used (504) 256-8813. Subscriber information for this number is Rudy Rodriguez, 21017 Highway 16, Franklinton, LA.  Law enforcement is familiar with Rodriguez, and knows him to be a frequent drug user. Nevertheless, law enforcement has used a pattern analysis to connect this phone number to **LAWRENCE**.  As discussed above, one of the heroin transactions involving **LAWRENCE** occurred on February 4, 2015.   On that day, Agents conducted physical surveillance of **LAWRENCE** as he traveled by himself to meet the UC.   **JOSEPH** neither traveled with **LAWRENCE** nor was physically present at the transaction.   However, **JOSEPH** used the **Target Telephone** to coordinate the transaction with the UC.  The UC met with Agents to begin calling the **Target Telephone** at 12:45pm, and eventually met with **LAWRENCE** to complete the transaction at 1:40pm.  During that 55-minute time frame, only two phone numbers were in contact with the **Target Telephone**—the UC's phone on four (4) occasions, and (504) 256-8813 on five (5) occasions.  Based on this information, Affiant believes that **JOSEPH** was using **Target Telephone** to coordinate meeting logistics between **LAWRENCE**, at phone number (504) 256-8813, and the UC.  In analyzing further contacts between **Target Telephone** and this phone number, beginning on January 29, 2014, **Target Telephone** had contact with this number on 178 occasions, with the last occurring on March 13, 2015.  Seventeen (17) of those contacts were text messages, with the last occurring on March 13, 2015.

40)     Through toll analysis of phones linked to **EALY** and **KIRTON**, Affiant suspects that **EALY** and **KIRTON** have also contacted **JOSEPH** at **Target Telephone** in furtherance of the drug-trafficking activities of the organization.

## NEED FOR INTERCEPTION

41)     The objective of this investigation is to obtain evidence to fully prosecute the **Target Interceptees**, their narcotics suppliers, and others as yet unknown involved in this drug trafficking organization.

42)     I believe that the interception of electronic and wire communications and E-911 Precise Location information over **Target Telephone** will enable the government to further the goals and objectives of this investigation.  Specifically, these include:

a) discovering the full scope and identification of key personnel involved in illegal drug trafficking on behalf of or in connection with **JOSEPH** and other members of the organization;

b) discovering the identities and roles of all suppliers of cocaine, crack cocaine, heroin, and/or other drugs or controlled substances to the identified conspirators;

c) discovering the identities and roles of the customers and partners of **JOSEPH** to include **EALY, LAWRENCE, KIRTON**, and others yet unknown;

d) discovering the management and disposition of proceeds generated by the organization's narcotics trafficking; and

e) obtaining admissible evidence which demonstrates beyond a reasonable doubt that **JOSEPH**, the **Target Interceptees**, and any later-identified targets committed the alleged violations set forth herein.

43)     Interception of electronic and wire communications over **Target Telephone** is necessary in this matter because normal investigative techniques have been tried and have failed to fully achieve the goals and objectives of this investigation, or appear reasonably unlikely to succeed if tried, or are too dangerous to be tried.  For example, NOGTF has successfully used a confidential informant and an undercover officer to buy heroin from **JOSEPH** and

LAWRENCE; however, the CS/UC have been unable to buy from **JOSEPH's** suppliers, making it difficult to identify further layers within the organization. NOGTF has used physical surveillance on the **Target Interceptees**, and has observed meetings between the **Target Interceptees** and individuals unknown to law enforcement; however, without further insight, investigators are unable to differentiate between innocuous meetings or locations and criminal meetings or locations. NOGTF has used precision location warrants to track **JOSEPH's** whereabouts; however, **JOSEPH** frequently spends the night in different locations, making it difficult to pinpoint **JOSEPH's** possible stash locations, and limiting the effectiveness of search warrants and trash pulls.

44)    The following is a list of the investigative techniques that have been used or considered thus far in this investigation. Details about the use of each technique with regard to **JOSEPH** and his criminal associates, the success or failure of the technique, and what the technique has accomplished or failed to accomplish with regards to the goals and objectives of this investigation are discussed. When a technique was not employed, an explanation is also included.

A.    **Confidential Sources/Cooperating Defendants**

45)    It is my experience that confidential sources generally have limited information, either furnished by a subject or learned secondhand from others. I believe that this would not, without evidence sought by this application, result in a successful prosecution of all members of this illegal drug trafficking operation.

46)    In the present case, a confidential source has been used by the investigating Agents and Officers. Although he/she has been able to provide information in varying degrees regarding **JOSEPH** and others, the information, by itself, is insufficient to achieve the goals and objectives of this investigation. In this investigation, the CS has been able to identify **JOSEPH** as a primary heroin dealer in the Saint Roch neighborhood. However, the CS is not in a position

28

to determine the specific roles and responsibilities of **JOSEPH** and his other criminal associates. The CS has only been able to identify a limited number of **JOSEPH's** associates. While CS has occasionally seen other unknown individuals accompany **JOSEPH** during the heroin transactions, he/she has been unable to determine the identity of those individuals, much less corroborate their level of involvement in **JOSEPHS's** network. CS has indicated that **JOSEPH**'s supplier was **EALY**, but the CS does not have knowledge of the current relationship between **JOSEPH** and **EALY**. Furthermore, the CS has not been able to identify the methods utilized by **JOSEPH** and his associates to store and transport narcotics and narcotics proceeds. While the CS is expected to continue to cooperate throughout the interception of **Target Telephone**, without that interception, the scope of **JOSEPH's** narcotics distribution organization cannot be identified.

## B.    Physical Surveillance

47)    Physical surveillance, in and of itself, even if highly successful, rarely succeeds in gathering evidence of the criminal activities under investigation. It is an investigative technique that is used to confirm meetings and other suspected, criminal activity between alleged participants, but often leaves the investigators with insufficient evidence to prove the purpose of the meetings and other activity.

48)    When physical surveillance is used in conjunction with court-authorized interception of electronic and wire communications, the purpose of meetings takes on a new significance and may constitute admissible, persuasive evidence of criminal activity.

49)    The subjects of this investigation are extremely cautious and aware of law enforcement surveillance. During a phone call with the UC on February 19, 2015, **JOSEPH** admitted as much—he told the UC that he suspected law enforcement presence in the area, and they adjusted their meeting plan accordingly.

50)     On many occasions, the NOGTF has attempted surveillance of **JOSEPH**. However, **JOSEPH** often successfully exercises counter-surveillance measures, using his driving and his familiarity with the Saint Roch neighborhood, to thwart law enforcement. For example, on November 25, 2014, NOGTF conducted physical surveillance on **JOSEPH** as **JOSEPH** drove in and around the Saint Roch neighborhood. While following **JOSEPH**, agents observed **JOSEPH** make numerous quick turns with no clear directional pattern. This is a common technique that subjects use to identify law enforcement. On that date, the NOGTF surveillance units abandoned their surveillance of **JOSEPH** to avoid being detected. Moreover, as described above, **JOSEPH** arranges his drug meetings through telephone calls. **JOSEPH** routinely requests that his customers drive to the Lowe's parking lot in Saint Roch, and then once they arrive, **JOSEPH** instructs the customers by phone to travel to a different location for the actual meeting. According to the CS, this technique allows **JOSEPH's** associates to surveill the customers in the Lowe's parking lot first for a possible law enforcement presence. **JOSEPH** will then identify an actual meeting location. The meeting locations vary, but they are almost always around Saint Roch, where **JOSEPH** and his associates grew up and are intimately familiar. When traveling to meeting locations, **JOSEPH** often takes unpredictable routes through Saint Roch. This neighborhood is ideally-suited for **JOSEPH's** counter-surveillance—it is made up of narrow, one-way streets, making it easy to spot law enforcement vehicles. Accordingly, Agents face an inherent disadvantage in conducting surveillance in this neighborhood. As a result of these techniques, Agents have had difficulty maintaining sight of **JOSEPH** during surveillance operations, much less identifying **JOSEPH's** associates and their activities.

51)     Agents have also attempted surveillance at **JOSEPH's** residence at 2320 Spain Street. To do so, Agents park at such a distance that they can only see **JOSEPH's** vehicles arriving and leaving, but they cannot identify anyone meeting with **JOSEPH** at the residence.

52)     For this investigation to be successful, electronic surveillance must be used in conjunction with physical surveillance.  Electronic surveillance is needed to identify individuals involved in the organization, locate meeting spots and "stash houses," and understand how the organization operates.  Without electronic surveillance, Agents will be unaware of **JOSEPH's** efforts to change his patterns and behaviors, thereby missing opportunities to gather evidence.

53)     Investigators in this case would continue conducting physical surveillance to complement the electronic surveillance, if permitted.  We anticipate that these techniques will lead to the identification of other associates involved in this organization, as well as the seizure of drugs and assets.

## C.     Attempted Use of Other Surveillance Techniques

54)     Agents have utilized other surveillance techniques in this investigation; however, none have resulted in fulfilling the investigative goals.  Specifically, NOGTF obtained four precision location warrants for the two cellular telephones used by **JOSEPH**.  Three of the warrants, each for a thirty (30) day period, have been authorized for phone number (504) 994-8173.  The fourth warrant, also for a thirty (30) day period, has been authorized for **Target Telephone**.

55)     The first two precision location warrants for (504) 994-8173 resulted in accurate data that was useful to Agents conducting physical surveillance.  The third warrant for (504) 994-8173 failed to produce any data, leading Agents to believe that **JOSEPH** discontinued the use of that number.

56)     The precision location warrant for the **Target Telephone** has resulted in data that was helpful, but not precise.  Most of the data points are only accurate within several hundred meters of the **Target Telephone**, providing Agents with general information about the **Target Telephone's** area, but not specific addresses or neighborhoods.  Accordingly, this information was not precise enough to identify, for example, locations where **JOSEPH** was storing his

narcotics or conducting transaction. Furthermore, although GPS location data on **Target Telephone** is helpful in attempting to surveill **JOSEPH**, this data only tracks the physical location of **Target Telephone,** and does not assist in identifying individuals meeting **JOSEPH** and the purpose of the meetings. When coupled with other investigative techniques, precision location data would continue to be useful to the NOGTF.

57)     A tracking device on **JOSEPH's** vehicle was not considered because **JOSEPH** appears to be highly surveillance-conscious and likely aware that law enforcement has the ability to place tracking devices on vehicles. Additionally, **JOSEPH** has been observed using at least three different vehicles during the course of the investigation.

**D.     Undercover Agents**

58)     An undercover agent has been utilized in this case. This UC has been able to corroborate information previously provided by the CS, and to obtain additional physical evidence by conducting controlled purchases of heroin from **JOSEPH** and **LAWRENCE**. The UC's cover story is that he/she is a heroin user, who pools money with other heroin users to make buys. Using this story, the UC has successfully purchased slightly larger quantities of heroin than the CS purchased. Nevertheless, the UC is limited by this story to purchasing only modest increases. While working within the limits of the cover, the UC will not be able to request heroin in a quantity that would lead to the determination of **JOSEPH's** heroin supplier. Likewise, **JOSEPH** has been able to accommodate the UC's requests for larger quantities of heroin without referring the UC to his source. In fact, on February 4, 2015, the UC told **JOSEPH** that he/she had come into a large amount of money, and he/she wanted to see if **JOSEPH** could sell larger quantities of heroin. **JOSEPH** said that he could accommodate the UC's request directly. Without being able to gain access to **JOSEPH's** supplier and other associates, the UC's usefulness in furthering this investigation is minimal.

59)     Moreover, based on Affiant's knowledge of drug organizations and street gangs, it appears to be highly unlikely that the UC or any other UC could infiltrate this organization as a member.  This is a tightly-knit group comprised of a small number of associates, many of which are related or grew up in Saint Roch.

**E.     Search Warrants, Trash Pulls**

60)     Other than the precision location warrants for **JOSEPH's** two phones, search warrants have not been executed in this investigation.  While search warrants may produce some evidence of criminal activity (such as heroin packaged for sale, drug paraphernalia, cash, and/or weapons), search warrants would not be effective at achieving the larger goals of this investigation.  To date, two residences and one business in the New Orleans area have been associated with **JOSEPH**.  However, through the use of precision location data on **JOSEPH's** telephones, investigators have learned that **JOSEPH** frequently spends the night at numerous other locations in the area.  It is not uncommon for **JOSEPH** to sleep in four or five different locations during the course of a week.  It is not known if any of these residences are being used by **JOSEPH** for illegal purposes.

61)     It is anticipated that, in the future, search warrants of residences belonging to **JOSEPH** and other associates/customers will be productive; however, any such search warrants at this time would reveal the investigation and provide limited information as to the methods and members of the narcotics distribution organization.

62)     Similarly, conducting a trash pull would not further the goals of the investigation.  Affiant fully expects **JOSEPH** to have one or more locations where he stashes heroin and drug paraphernalia.  However, given the numerous locations routinely visited by **JOSEPH**, it is impossible to know which location is most likely used by **JOSEPH** to store contraband.  Moreover, conducting a trash pull of **JOSEPH's** residences and finding drug distribution evidence would only further the investigation as to **JOSEPH**, against whom the evidence is

already extensive.  It is unlikely that a trash pull will help to identify the full scope of the organization and its other members.  Yet, a trash pull runs some risk of revealing the investigation to **JOSEPH**.

63)   In any case, it is unlikely that the use of search warrants, in and of themselves, would meet the goals and objectives of this investigation.  Evidence seized would only implicate the individual directly associated with it, and not the entire organization.  Finally, in order to achieve maximum effectiveness, a search warrant must be coordinated with information concerning the immediate whereabouts of the sought-after evidence.  This is best achieved with the interception of telephone calls.  Intercepted communications can inform investigators of the immediate presence of drugs, weapons, or other contraband in a timely manner.  A search warrant could then follow.  The use of these two techniques in conjunction with one another is the most effective way to seize contraband, secure evidence, and ultimately provide evidence against other associates, which will disrupt or dismantle their criminal organization.

F.    **Interviews/Grand Jury Subpoenas/Immunity**

64)   Interviews, particularly of the CS, have been conducted during the course of the investigation, and have been effective in gathering information on the membership and operation of the narcotics distribution organization.  If any interviewees had decided not to cooperate with law enforcement, they could have easily notified **JOSEPH** and jeopardized the investigation.  While these interviews did lead to valuable information, the information is historical, and given from an outsider's perspective.

65)   Further interviews may have the effect of alerting the **Target Interceptees** and others, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence.  Additionally, if the **Target Interceptees** are alerted to the government's investigation, they may flee the jurisdiction in order to avoid apprehension and prosecution.

34

66)   Based upon my training and experience, I do not believe a Grand Jury investigation using subpoenas would be successful for the following reasons:

a)  subjects of the investigation, such as **JOSEPH**, **EALY**, **LAWRENCE**, and **KIRTON**, if called to testify, would most likely invoke their Fifth Amendment privileges;

b)  it would likewise be unwise to give Grand Jury immunity for any of the subjects, as it might foreclose prosecution of the most culpable people; and

c)  most of the individuals who have been identified in this investigation have participated in various forms of illegal activities and would likely lie under oath unless confronted with facts forcing them to tell the truth.

## G.    Controlled Purchases

67)   During the course of this investigation, NOGTF Agents and other law enforcement officers have used CS and UC to make at least eleven (11) controlled purchases of narcotics from the **Target Interceptees**. The controlled purchases have assisted in gathering evidence in the investigation; however, the controlled purchases have only gathered evidence against **JOSEPH**, **EALY**, and **LAWRENCE**. The purchases have not helped to identify other members of the narcotics distribution organization (including the supplier), roles played by each member, residences used to store narcotics, and additional operational methods. Further controlled purchases from **JOSEPH** would not assist in fully reaching the goals and objectives of this investigation.

## H.    Telephone Toll Records and Pen Registers

68)   Toll records and pen registers are useful in identifying telephone numbers communicating with **Target Telephone**, but do not identify those individuals actually making and receiving the telephonic communications. Additionally, they do not reveal any criminal activity in the content of the involved communications. In this investigation, Agents have used toll records and pen register information to confirm contacts between CS, UC, and **Target**

**Telephone** around the time of the controlled buys. Moreover, agents have also used pen register and toll information to identify phone numbers of associates. However, without Title III interception, it is extremely difficult to prove the identities of those using the telephones, because most subscribers are listed under false identities.

## I.     Consensual Recordings / Oral / Wire Interceptions

69)     Consensual recordings alone are not sufficient to fully develop the precise nature, dates, scope, and location of the illegal activities under investigation as to all participants in the criminal scheme. In this case, consensual recordings were utilized prior to the controlled buys. Although sufficient evidence exists to arrest and prosecute **JOSEPH** for distributing small quantities of heroin, doing so would compromise law enforcement's ability to seize other evidence, identify co-conspirators, and potentially identify drug suppliers to the organization.

## J.     Financial Investigation

70)     To date, there are no known bank accounts being utilized by **JOSEPH**.

## K.     Other Limitations

71)     As demonstrated above, the investigation to date has been marginally helpful in identifying participants in criminal activity and determining a limited organizational structure. Only electronic and wire interception will permit investigators to determine the precise nature and scope of the illegal activity being conducted and assist in gathering critical evidence concerning such activity. Based on information provided by the CS, law enforcement believes that **JOSEPH** received heroin from **EALY**. However, further corroboration of these statements is necessary to meet the prosecutorial goals of this investigation. Confidential sources have not been able to provide an in-depth knowledge of the structure and operating procedures of the group, and it is not anticipated that any of the confidential sources will be able to do so in the future. The narcotics distribution organization is deemed violent due to the violent nature of narcotics dealing and based on the violent criminal histories of its members. The scope of the

criminal activity engaged in by this organization, and the public danger it presents, make the use of ordinary investigative methods ineffective and the use of electronic and wire interception essential. Only with contemporaneous interception of electronic and wire communications can law enforcement officials have the opportunity to be in a position to gather sufficient evidence concerning the planning, coordination, and carrying out of the illegal activities of this organization.

72)   Based on the analysis of calling patterns and associated conduct, Affiant believes the **Target Interceptees** are engaging in ongoing communications that involve the **Target Offenses** using **Target Telephone**. It is reasonable to anticipate that **JOSEPH** will engage in communications over **Target Telephone** with the **Target Interceptees**. Interception of these communications will enable the investigation to obtain evidence confirming the criminal involvement and culpability of the participants in the scheme. Based upon the foregoing, Affiant concludes that the interception of electronic and wire communications is an essential investigative means in obtaining evidence of the offenses in which the **Target Interceptees** are involved.

## **MINIMIZATION**

73)   All wire interceptions will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and all interceptions conducted pursuant to this Court's Order will terminate upon the authorized objectives or, in any event, at the end of thirty (30) days measured from the earlier of the day on which law enforcement officers begin to conduct and interception under the Court's order or ten (10) days after the Order is entered. Monitoring of conversation will terminate immediately when it is determined that the conversation is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, otherwise, that none of the **Target**

**Interceptees** or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If a conversation has been minimized, the monitoring agent will spot check to ensure that the conversation has not turned to criminal matters.

74)    While not anticipated, in the event that the **Target Interceptees** are intercepted conversing in code or a foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception. In the event the translator/expert is not a federal agent, the translator/expert, whether a language-trained support employee or someone under contract with the government, will be under the direct supervision of a federal agent. If, however, a translator/expert is not reasonably available, the following after the fact minimization procedures have been established, pursuant to Title 18, United States Code, Section 2518 (5):

a)  All such foreign language/code conversations will be intercepted and recorded in their entirety;

b)  As soon as practicable after such interception, these conversations will be reviewed and minimized by a translator/expert under the guidance of a federal agent authorized to conduct the interception, after which translation of the pertinent criminal conversations will be furnished to the supervising federal agent.

75)    All monitoring of electronic communications will be conducted in accordance with Chapter 119 of Title 18, United States Code. Each text message will be reviewed electronically over a secure system by a monitoring agent who will determine, based on the identities of the sender and recipient and the content of the message, whether the text message appears to be criminal in nature. If the message is not criminal in nature, the message will be flagged as "minimized" or "non-pertinent" and secured from access by other members of the investigative team. If the message appears to be privileged, it will be marked "privileged" and

secured from access by other members of the investigative team. If a text message appears to be relevant to the investigation or otherwise criminal in nature, it will be marked "non-minimized" or "pertinent" and may be shared with the other Agents and may be shared with other Agents and monitors involved in the investigation. If a text message is marked "minimized", "non-pertinent," or "privileged," it will not be disseminated to members of the investigative team. All intercepted text messages will be sealed with the Court upon the expiration of the Court's order authorizing the interception. It is anticipated that the monitoring station will not be staffed at all times. When staffed, the intercepted communications will be monitored and read (including those intercepted at hours when the location was not staffed). However, even when unmanned, the monitoring location will be kept secured with access limited to only authorized monitoring personnel and their supervising agent.

76) Monitoring Agents of these interceptions are expected to include personnel from the Federal Bureau of Investigation, New Orleans Police Department, and High Intensity Drug Trafficking Area (HIDTA) contract monitors.

## REQUEST FOR E-911 LOCATION INFORMATION

77) Affiant requests that this Order include the provision of E-911 location information by Sprint. As set forth in this Affidavit, there is probable cause to believe that JOSEPH has used the Target Telephone in furtherance of drug distribution. Agents have obtained one precision location warrant that has provided location information of the Target Telephone for approximately thirty (30) days, but that information has only allowed Agents to determine the general location of Target Telephone, not specific addresses or neighborhoods. Agents have observed JOSEPH distribute drugs at more than one address, and therefore E-911 location information will be useful in determining the full extent of his illegal activity. Moreover, in Your Affiant's training and experience, drug dealers use "heat runs" and other counter-surveillance techniques. E-911 location information will allow Agents to track the

39

movements of **JOSEPH** while he is engaging in this activity without risking being identified as law enforcement.  Where law enforcement must end physical surveillance to avoid detection by **JOSEPH**, E-911 location information will allow law enforcement to locate **JOSEPH**.

**PERIOD OF INTERCEPTION**

78)    The activity subjected to electronic surveillance is believed to be a continuous criminal conspiracy, and Affiant submits that, on the basis of the facts and circumstances detailed in this Affidavit, there is probable cause to believe that the evidence sought will be obtained on a continuing basis following the first interception of the particular communications which are the object of this request for interception.  Therefore, it is requested that the Court order for the interception not terminate when the communications described herein are first intercepted, but may continue until the nature of the conspiracy and full scope of the illegal activity is developed, including the identities of all participants, their places and methods of operation, and the various activities in which they are engaged, or, in any event, for a period of thirty (30) days.

79)    Affiant requests that the time set forth in the order run from the earlier of the day in which the investigative or law enforcement officer first begins to conduct the interception or ten (10) days from the date of the order.

80)    Pursuant to provisions of Section 2518(4) of Title 18, United States Code, the court may, pursuant to a request of the applicant, direct that a communication service provider, landlord, custodian, or other person furnish the applicant forthwith all information, facilities, and technical assistance  necessary to accomplish the interception unobtrusively.  The assistance of Sprint is required to accomplish the objectives of the required interceptions.  Reasonable expenses incurred pursuant to this authority will be processed for payment by the FBI.

81)    Affiant requests that the authorization given is intended to apply not only to the **Target Telephone** number listed above, but also to any other telephone number subsequently

assigned to or used by the instrument bearing the same electronic serial number used by the **Target Telephone**, within the thirty-day period.  The authorization is also intended to apply to the **Target Telephone** number referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the **Target Telephone** while the telephone is off the hook or otherwise in use.  Affiant further requests the authorization to intercept any voice messages as they are contemporaneously left or retrieved on the **Target Telephone**.

82)     Affiant requests that, pursuant to 18 U.S.C. Section 2518(3), that in the event that the **Target Telephone** is transferred outside the territorial jurisdiction of this Court, interceptions of the transferred facility may continue to take place in the Eastern District of Louisiana where all communications will first be heard or read and minimized regardless of where the wire and/or electronic communications are placed to or from.

83)     Wherefore, because of the existence of facts and underlying circumstances of the continuing investigation listed above, Your Affiant submits that the probable cause to intercept electronic and wire communications to and from the **Target Telephone**.

ROBERT BAIRD
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


Subscribed to and sworn before me,
this 27th day of March, 2015,
in New Orleans, Louisiana.

UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF LOUISIANA

41